IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STEVEN E. SHAW )<br>    1981 Grandon Loop Road )<br>    Virginia Beach, VA 23456, )<br>     )<br>    Plaintiff, )<br>     )<br>    v. )<br>     )<br>THE HONORABLE MARK T. ESPER )<br>    Secretary of Defense )<br>    Department of Defense )<br>    1000 Defense Pentagon )<br>    Washington, DC 20301-1000, )<br>     )<br>THE HONORABLE KENNETH )<br>BRAITHWAITE )<br>    Secretary of the Navy )<br>    Department of the Navy )<br>    1000 Navy Pentagon, Room 4D652 )<br>    Washington, DC 20350, )<br>     )<br>    Defendants. ) | CIVIL ACTION NO. |

## **COMPLAINT**

Plaintiff, Lieutenant (Lt.) Steven Shaw, United States Navy ("Navy"), by and through

undersigned counsel, files this Complaint against the defendant, alleging as follows:

## **PARTIES**

1. Plaintiff Lt. Shaw is an active duty officer in the Navy.

2. Defendant Dr. Esper is the Secretary of Defense and is named in his official capacity as the

   head of the Department of the Defense (DoD), which has failed to timely act on an appeal of

   substantiated findings of Military Whistleblower Relation.

3. Defendant Mr. Braithwaite is the Secretary of the Navy and is named in his official capacity

as the head of the Department of the Navy (DON), which has failed to timely implement certain corrective actions upon a finding of substantiated whistleblower reprisal.

## JURISDICTION AND VENUE

4. This action is brought under the Administrative Procedures Act (APA), 5 U.S.C. § 701, et seq, due to Defendants' failures to act on an appeal and implement corrective action under Military Whistleblower Reprisal Protection Act (MWPA), 10 U.S.C. § 1034, as well as Defendant Braithwaite's depravation of Lt. Shaw's constitutional rights to Due Process and disregard for procedures required by law.

5. The APA permits judicial review of final agency by which an individual is adversely affected or aggrieved. 5 U.S.C. §§ 702, 704. Final agency action is defined as an agency's "failure to act." 5 U.S.C. § 551(13). The declaratory relief requested herein is proper under 5 U.S.C. §§ 706(1)-(2).

6. Venue is proper in this Court under 28 U.S.C. § 1391(e) because this is the judicial district in which Defendants are located and is where a substantial part of the events or omissions giving rise to the claim occurred.

## INTRODUCTION

7. During April 2017 two black student fighter pilots (SPs) in Strike Fighter Squadron 106 (VFA-106) approached a white fighter pilot instructor, Lt Shaw, out of concerns with regard to the bases of their respective failed progressions. They were the only two black SPs in VFA-106 during their tenures, respectively. Such low numbers of minorities in Naval Aviation has been a continuing trend throughout the Navy's history. In 1949, Jesse Brown became the first black fighter pilot in Navy history. Seventy-two years later there are still only twenty-four black fighter pilots in the Navy. In July 2020 the Navy winged its *first*

black woman Navy jet pilot after 47 years of women serving in aviation. Out of more than 7,000 Naval Aviators only five are black women. Lieutenant Shaw scrutinized the circumstances and found that both pilots had cause for concern and should formally raise those concerns through the Navy's Equal Opportunity (EO) process and Congressional Inquiries. Lieutenant Shaw assisted in these filings.

8. Once the Navy learned Lt. Shaw was responsible for making this information available outside of the Navy, the Navy undertook a deliberate and far reaching scheme to undermine his credibility and destroy his Naval career through the pursuit of a retaliatory command directed investigation (CDI) and numerous administrative actions intended to strip him of a security clearance, his Naval Aviator wings, promotion, and reputation.

9. The Secretary of the Navy, after being confronted with the reprisal activity as substantiated by the DoD Inspector General (IG), on or about January 2020, directed that all of the adverse actions be rescinded which were premised on the corrupt CDI. The investigation process was corrupt in that the investigator was found to have written statements for witnesses, and witnesses were found to have made false official statements in support of the adverse actions being pursued against Lt. Shaw. In addition, investigating officials confirmed that the allegations of racist activity were found to be substantiated, which was communicated via telephone, but when the report was written up they were determined to officially be only partially substantiated, and months later, fully unsubstantiated. The Secretary of the Navy also authorized another "clean" investigation be conducted on Lt. Shaw, focused on the same issues and witnesses with a caveat that neither the witnesses nor the investigator could rely on their previous statements.

## FACTUAL BACKGROUND

### Whistleblower Reprisal.

10. Lieutenant Shaw commissioned in the Navy in May 2009. In October 2016, he transferred from VFA-131 to VFA-106 at Naval Air Station (NAS) Oceana, Virginia, as an F/A-18 Instructor Pilot (IP).

11. Beginning in April 2017, Lt. Shaw became intertwined with the EO cases of two African American SPs in VFA-106. Both SPs were experiencing racial discrimination at the hands of numerous IPs and the chain of command at VFA-106. The extent of the racial discrimination, which resulted in the disenrollment of both SPs from the F/A-18 training pipeline,[1] was quite alarming, and included such acts as derogatory comments about the two in a WhatsApp communication group amongst IP graduates of the Naval Academy; this group referred to themselves as the "Pure Bloods." Lieutenant Shaw's involvement consisted of assisting the two SPs in drafting congressional inquiries and EO complaints, and correspondence with Senator Mark Warner's office on the matter.

12. In November 2017, Lt. Shaw was approached by numerous SPs regarding the illegal practice of gambling between pilot instructors and students in exchange for alcohol called "bottle bets" during the recent Carrier Qualification (CQ) phase of instruction, which are described as follows:

---

[1] Following completion of the EO investigation, one of the pilots was reinstated in training. *See* https://www.military.com/daily-news/2019/07/11/marine-pilot-will-get-2nd-shot-fighter-training-after-racial-bias-investigation.html (last visited December 10, 2019). The other pilot was discharged from the Navy prior to completion of the investigation. The EO investigations, which were previously substantiated by Vice Admiral Miller, have since been unsubstantiated by Rear Admiral Kelley following publication of DoD IG report of whistleblower retaliation, discussed herein. The appeals of those investigations are ongoing, and are the subject of a lawsuit in this Court under the Freedom of Information Act. Case No. 1-19-cv-02983-ABJ.

> Bottle bet wagers are wagers between the [Landing Signal Officer (LSO)] instructors and student pilots related to the student's performance (i.e., catching the target wire, maintaining a certain boarding rate, no technique wave offs or bolters) during CQ that were paid off with bottles of alcohol. The LSO instructor would grade the student's performance and inform them at the completion of the CQ as to the outcome of their bet.

One of the concerns besides the illegal gambling activity, fraternization between instructors and students, and fostering of a frat- like culture/ atmosphere of alcohol consumption within the Naval Air community, was that the practice was geared by the instructor LSO's to manipulate student performance given that the assignment of marks was entirely within their discretion.

13. Lieutenant Shaw filed a complaint with the United States Fleet Forces Command (USFF) IG office on November 3, 2017, informing that the bottle bets were being conducted in violation of 5 C.F.R. § 2635.301, "Gifts Between Employees." Attached to the IG complaint were several supporting documents, including correspondence informing the SPs that "[a]ll bets must be settled prior to receiving CQ stamp in logbook." The USFF IG forwarded the matter to the Commander, Naval Air Forces Atlantic (CNAL) IG, which then sent a copy of the complaint to the Commander, Strike Fighter Wing Atlantic, who in turn forwarded it to the LSO community; a large uproar resulted within VFA-106 and the LSO community, and the complaint was soon distributed across the entire fleet.

14. On December 15, 2017, the Executive Officer (XO) for VFA-106, Lieutenant Colonel (Lt. Col.) Nesbitt, held an all-instructor meeting, during which he said that "bets [bottle bets] are a naval aviation tradition, and if anyone wants to make bets, they can." He also publicly announced that there would be negative consequences for anyone who seeks redress through IG channels. With no resolution being taken to discontinue the bottle bets, Lt. Shaw felt it

necessary to elevate the issue to Senator Warner's office, which he did on December 19, 2017.

15. Senator Warner's office forwarded the matter to the Naval Inspector General (NAVINSGEN), and an IG investigation was opened. Upon best information and belief, Commander (Cmdr.) Roberts, the former head of the LSO school and the individual who ended up serving as the IO for the CDI against Lt. Shaw, learned of the IG investigation, and sent correspondence to the CNAL (Rear Admiral (Adm.) Roy Kelley), the Commander, Naval Air Forces (CNAP/F) (Vice Adm. DeWolfe Miller), and the Chief of Naval Air Training (CNATRA) stating that he was "attempting to check" his emotions, but could not "hide [his] passion," and that he had "serious concerns" for the Navy's heritage, culture, and warrior ethos if it "len[t] credence to individuals that do not have the character or fortitude to address these issues in person."

16. On February 24, 2018, the CNAF, Vice Adm. Miller–the same individual who initially substantiated the EO investigations of the two African American SPs but then remanded them for further investigation allowing them to become unsubstantiated–released a message to all Naval Air forces terminating the practice of bottle bets. Vice Admiral Miller wrote, in part, that "practices like bottle bets with landing signal officers casts those in positions of leadership and mentoring as betting against the success of their charges … And practices where instructors expect to receive gifts from their students do not reflect who we are."

17. Upon receipt of Vice Adm. Miller's message terminating bottle bets, and upon best information and belief, Cmdr. Roberts wrote a rage fueled email encompassing his disdain for those who brought about the end of this practice, and insinuating that the command had cowed to Lt. Shaw's IG complaints. He concluded his email with, "Don't get me wrong; I'm

not trying to burn this place down. I want to burn the rest of the motherf*****'s houses down, so ours is the one left standing. The last beacon of hope and a safe haven for those that still believe in what we should stand for."

18. On March 6, 2018, Cmdr. Roberts composed another email stating "bottle bets are forbidden … after a malcontent VFA-106 core IP launched a Navy and congressional IG on tradition that dates back to straight decks on the Great Lakes. Giant can of worms that I'm considering on how to unleash on the world."

19. On April 4, 2018, an article regarding the racial discrimination against the two African American SPs Lt. Shaw previously assisted was published on *Military.com*. Lieutenant Shaw was quoted in the article expressing his belief that "the uniform nature of pilot culture creates a breeding ground for implicit biases of all kinds to take hold, including racial, gender, and even personality-based prejudice." The article "drew the ire" of many of the IPs. Indeed, upon best information and belief, Lt. Col. Nesbitt was quoted saying, "I'm going to destroy him," which, to others, appeared to be a statement expressing his intent to retaliate against Lt. Shaw.

20. On April 5, 2018, Cmdr. Martin Weyenberg, then Commanding Officer (CO) of VFA-106, called Lt. Shaw to discuss the *Military.com* article and informed Lt. Shaw that he would be left off the flight schedule for April 6, 2018, to let people "calm down." During the call, Cmdr. Weyenberg also discussed whether Lt. Shaw was teaching the "standard," and that if Lt. Shaw "had different techniques for doing things in the aircraft, 'that was okay, after he [Lt. Shaw] finished the Instructor Under Training (IUT) syllabus."

21. Following the publication of the *Military.com* article, Lt. Shaw's command forced him to undergo a command directed assessment of his "mental state," a euphemism for a command

directed mental health evaluation convened for the purpose of giving the command reason to take further adverse administrative action against Lt. Shaw.

22. On April 11, 2018, an all-instructor meeting was held to discuss syllabus and instructional standardizations, and the process for IPs to submit change requests. This was the first time such information was disseminated in a public setting to the IPs, and based on the timing of the meeting in relation to the publication of *Military.com* article–of which the entire squadron had knowledge–it was apparent the meeting was convened to publicly debase Lt. Shaw.

23. The very next day, on April 12, 2018, per the guidance provided at the all-hands meeting, Lt. Shaw submitted four change requests to his chain of command and all VFA-106 IPs, one of which recommended introducing mechanisms into the syllabus that encouraged individuals to, or at least protected individuals who do, "speak up." Lieutenant Shaw's expressed concern when submitting the change requests was that "[t]he kind of ostracism and retaliation [he] received for reporting institutionalized illegal behavior [bottle bets], such as being recommended to a mental health evaluation, send[s] a very clear message that anyone who attempts to improve or change the organization for the better will be met with extreme negative and potentially career-ending consequences." Upon best information and belief, Lt. Col. Nesbitt forwarded his copy of the email to his personal email account. He also forwarded a copy of the email to Cmdr. Roberts to use as evidence in the CDI.

24. On April 25, 2018, one of the SPs, Lieutenant Junior Grade (Lt. j.g.) Ryan Rojeski, disqualified (DQ) during CQ due to an in-flight engagement caused by a late wave-off from the LSOs standing on the flight deck. Lieutenant Junior Grade Rojeski was required to attend a Performance Review Board (PRB)–which ended up being three, as the first two were deficient. During each one of the Boards, Lt. j.g. Rojeski was asked whether he had worked

with Lt. Shaw in preparation for the CQ, and was told he would be given a "free pass" if he

implicated Lt. Shaw in any wrongdoing. While Lt. j.g. Rojeski said he had worked with Lt.

Shaw in other phases of training, he did not receive any training from Lt. Shaw during CQ.

25. Despite the fact that flight data proved Lt. j.g. Rojeski's DQ was caused by a late wave-off

from squadron LSOs, and had nothing to do with Lt. Shaw, for the first time, Lt. Shaw was

directed not to work with the SPs on May 3, 2018.

26. The next day, May 4, 2018, Lt. Col. Nesbitt and Cmdr. Weyenberg met with a Staff Judge

Advocate (SJA) to receive guidance on potential courses of action against Lt. Shaw. During

this meeting, Lt. Shaw's command purposefully misrepresented certain facts, in order to

receive guidance that would fit their desired end state of having a CDI that was "conducted

via 'concrete legal means.'" They insinuated that Lt. Shaw was teaching "unauthorized CQ

techniques" to SPs which had resulted in mishap or injury, purposefully omitting the fact that

Lt. j.g. Rojeski, the one SP they were referring to, did not receive any such instruction from

Lt. Shaw.

27. Based on the misleading information, the SJA advised Lt. Shaw's command to issue Lt.

Shaw a letter of instruction (LOI) to serve as a formal counseling document to note any

deficiencies, and to see if Lt. Shaw's conduct improved. Alternatively, the SJA advised that

if the command felt the LOI would not be useful, then they could initiate a CDI with "a

neutral third party" to serve as the IO, and once the investigation was complete, the findings

could be reviewed to determine the next steps. The command elected to pursue the CDI

because they had "a lot of suspicions, but [not] a lot of evidence," and they wanted to "go in

and dig a little bit more." This same SJA was then ultimately used by the command as the

legal advisor in an attempt to make the CDI appear "neutral" in the event the CDI was

appeal.

28. With the approval to convene a CDI from a "neutral" judge advocate, Lt. Shaw's command

began drafting the appointing order. The proposed scope of the investigation covered the

following alleged violations:

> a. The dissemination of inappropriate information/techniques and use of non-standardized instructional methods to junior students and aircrew IRT [in relation to] landing on board USS Ship [CQ phase]. The scope of these techniques is not limited to only the CVN environment, but the VFA-106 F/A-18 FRS syllabus.

> b. The misuse of VFA-106 share drive information, and deliberate use of false impressions IOT [in order to] embarrass instructor cadre, create false impressions to former VFA-106 students, and misrepresent facts IRT racial bias within the unit to the media IOT further personal objectives, undermining the chain of command.

> c. The level, appropriateness and integration of the Complainant's relationship to junior students. Specifically, the use of his position as a future instructor, more experienced aviator and senior [Lt.] to further personal objectives, creating a non-graded evaluation system.

> d. Failure to inform, utilize, and allow the chain of command to address and solve problems.

> e. Not following orders when directed not to continue to instruct and interact with students.

> f. The deliberate allowance of the expiration of his personal SWIM PHYS [Aviation Physiology Training and Aviation Water Survival Training Program qualifications] IOT prevent being involved in Strike training onboard NAS Fallon, [Nevada].

> g. Allowing junior aircrew to be blamed, ridiculed and mistreated after deliberately filing an Inspector General Complaint.

29. After two days of collaboration and discussion on the scope, a CDI was appointed with Cmdr. Roberts–the former head of the LSO school, and thus a significant influence in the community which had been conducting the illegal bottle bets–to serve as the IO. The scope of the CDI changed drastically from the draft, and was reduced to the following:

> a. The dissemination of inappropriate information/techniques and use of non-standardized/reviewed instructional methods to junior students and aircrew IRT CAT-1 Carrier Qualification. The scope of your inquiry is not limited to only the CVN [carrier] environment, but also the VFA-106 F/A-18 FRS syllabus, and whether the instruction provided by [Lt. Shaw] comports with the Naval Air Training and Operating Procedures Standardization.

> b. The misuse of VFA-106 share drive information and sharing inappropriate information for unauthorized purposes.

> c. The level, appropriateness and integration of [Lt. Shaw's] relationship to junior students. Specifically, the use of his position as an instructor, more experienced aviator and senior lieutenant for inappropriate or unauthorized reasons, including, but not limited to, his contact with 17-4 student pilots and his alleged direct involvement in PRB discussions between a student and the PCO [prospective commanding officer].

30. Shortly after being appointed as the IO, Cmdr. Roberts sent an email stating that he was appointed as "the investigating officer into a [VFA-]106 IP [Lt. Shaw] who has been f*****g some s**t up in all our worlds," and that he was specifically appointed because "[t]hey need[ed] a bullet-proof O-5 willing to kamikaze this guy." He concluded his email stating that he was "looking forward to it in a very weird way."

31. Throughout the investigation, Cmdr. Roberts engaged in questionable "investigative techniques," to include:

> a. Shaping witness statements: In approximately 30 instances, Cmdr. Roberts sent witnesses and non-CDI personnel his *personally prepared* LSO recommendation document

with his perceived acceptable techniques for carrier landings, as well as witness statements from other CDI witnesses. He also provided the witnesses with proposed language for their statements which Cmdr. Roberts said would help him substantiate his findings and recommendations against Lt. Shaw.

b. <u>Creating bias against Lt. Shaw</u>: In at least 20 instances, Cmdr. Roberts attempted to create witness bias against Lt. Shaw by disclosing Lt. Shaw's previous IG filings, and opining that Lt. Shaw would likely file more IG complaints in the future. Commander Roberts also requested multiple "offline" conversations with senior naval personnel in positions that could influence Lt. Shaw's career, and discouraged them from having Lt. Shaw join their squadrons.

c. <u>Exclusion of favorable or exculpatory evidence</u>: Cmdr. Roberts purposefully excluded statements from the CDI witnesses who provided testimony in support of Lt. Shaw. One in particular informed Cmdr. Roberts that he had served with Lt. Shaw at his previous command, VFA-131, and that while there, Lt. Shaw, with the assistance of this individual who was also an LSO, had developed CQ training materials that were known within the command (thereby impacting Cmdr. Roberts' ability to argue that Lt. Shaw taught techniques unknown by the command or in violation of any order from VFA-131 not to instruct the material). After Cmdr. Roberts learned of this information, he declined to receive a written statement from the witness, stating "he had pretty much gotten everything he needed or wanted for his investigation at that point."

32. It was readily apparent that Cmdr. Roberts' sole purpose in conducting the CDI was to assist the command in justifying future actions. By May 24, 2018, well over a month before the investigation concluded, and after only speaking with five witnesses (two of whom were

provided draft statements by Cmdr. Roberts), Cmdr. Roberts sent an email to the command

stating he already had enough information to justify convening a FNAEB, which is a

subjective review board convened under MILPERSMAN 1610-020 to determine whether the

individual should be allowed to continue serving as a Naval Aviator.

33. On June 25, 2018, Naval Criminal Investigative Services (NCIS) was contacted by Cmdr.

Roberts to open an investigation on Lt. Shaw for allegedly recording videos in flight

simulators at VFA-106 and for sharing the videos (supposed classified information). This

was presumably based on Cmdr. Robert's interview of one of the CDI witnesses, Lt. Keedy,

who said Lt. Shaw showed him a video of what he (Lt. Keedy) believed was a flight

simulator. Despite Lt. Keedy stating that he saw *no* classified information in the videos,

Cmdr. Roberts sought an investigation into Lt. Shaw for mishandling classified information.

The NCIS agent was briefed on this information, and found insufficient evidence to initiate

an investigation–even with the low threshold burden of proof required for the initiation of an

investigation and the titling of a subject. On July 3, 2018, Lt. Col. Nesbitt, without sufficient

command authority and evidence to do so, then suspended Lt. Shaw's access to classified

information on the basis of the same unsubstantiated allegation. An incident report was also

placed in Lt. Shaw's Joint Personnel Adjudication System (JPAS) Account, triggering an

investigation by the DoD Consolidated Adjudication Facility (CAF) into whether Lt. Shaw

should be permitted to retain his security clearance, and ultimately a

recommendation/preliminary determination by DoD CAF to revoke Lt. Shaw's security

clearance.

34. On July 19, 2018, upon best information and belief, Cmdr. Roberts emailed a draft copy of

the CDI from his personal email account to another person stating, "Let the light at the end of

the tunnel be a train. May this attachment be that train." Commander Roberts recommended the command take criminal action against Lt. Shaw.

35. Following his review of the CDI, Cmdr. Brandon Scott (then-current VFA-106 CO), notified Lt. Shaw that he would be convening a Human Factors Board (HFB)–designed to assess personal issues negatively impacting flight performance, even though Lt. Shaw had shown no poor flight performance and had been prohibited from flying months earlier. The HFB convened on August 2, 2018. Three of the four members of the HFB were permitted to review the CDI prior to the HFB convening (a copy of which had not been provided to Lt. Shaw, despite his request).

36. Around the same time, Cmdr. Scott issued Lt. Shaw Temporary Assigned Duty (TAD) orders to the Air Operations Department at the base control tower. He was relegated to the corner of the Assistant Operations Officer's Office for approximately 1 month, after which he was moved to the lobby (where he remains to this day), essentially as a public display and warning to others on what consequences to expect should they also report wrongdoings.

37. On or about August 15, 2018, Lt. Shaw was notified that the DoD IG would be investigating potential whistleblower reprisal against him by Lt. Col. Nesbitt (VFA-106 XO), Cmdr. Weyenberg (former VFA-106 CO), Cmdr. Roberts (CDI IO), and Cmdr. Scott (then-current, now-former, VFA-106 CO).

38. On August 29, 2018, pursuant to Cmdr. Robert's recommendation for disciplinary action, Lt. Shaw was offered NJP under Article 15, UCMJ, alleging five specifications of Article 92 (Failure to obey order or regulation): (1) that Lt. Shaw failed to obey lawful orders issued at both VFA-131 and VFA-106 not to teach techniques detailed in the "F-18 Ball Flying Techniques" white paper; (2) that Lt. Shaw failed to obey an order not to use a recording

device inside a flight simulator by making a recording at some point between September 2016 and January 2018; (3) that Lt. Shaw failed to follow an order by Lt. Col. Nesbitt by having communication with Lt. j.g. Rojeski on divers occasions between May 3, 2018 and July 20, 2018; (4) that Lt. Shaw failed to obey an order by Lt. Col. Nesbitt not to enter the F/A-18 Flight Simulator Facility student ready room; and (5) that Lt. Shaw failed to obey an order from Lt. Col. Nesbitt not to instruct SPs in phases he was not qualified to teach.

39. Upon advice of military defense counsel, and knowing that the allegations were based on evidence derived from a faulty investigation (despite the fact he was *still* precluded from reviewing the CDI, and that other officers, outside the chain-of-command and without a "need to know"–to include officers in a *separate unit* in a *separate state*: VT-21, a unit in Kingsville, Texas–had been permitted to review, and/or were informed of the content of, the investigation) Lt. Shaw exercised his right to refuse NJP and demanded that the command try him on these alleged charges by trial at a court-martial. Following discussion with an SJA, Cmdr. Scott elected *not* to pursue court-martial charges. This is presumably because the SJA advised that the evidence gathered during the CDI was not only unreliable and tainted by unlawful whistleblower retaliation, but that there was insufficient evidence to sustain a conviction on *any* of the alleged charges.

40. Instead of pursuing criminal charges, which would be subject to judicial scrutiny and afford Lt. Shaw the right to have a detailed military defense counsel, Cmdr. Scott, by and through the direction and convening authority power of Rear Adm. Kelley, elected to convene a FNAEB, which is an administrative action solely under the discretion and direction of the chain of command, and at which Lt. Shaw is not afforded the right to counsel. The use of a FNAEB is almost exclusively reserved for instances resulting in damage to aircraft or gross

error while flying, and not the supposed violations committed by Lt. Shaw. He was notified on October 3 that the board was to be held on October 9, 2018 (despite having pre-approved leave for October 5 – 9, 2018). The same charges previously presented at NJP were used as the bases for the FNAEB.

41. The FNAEB was held over several days in October 2018–the length and delay of which was largely due to myriad procedural violations which caused multiple adjournments of the board. A bulk of the evidence presented by the command at the hearing was the retaliatory CDI. One of the main government witnesses presented at the FNAEB was Lt. Col. Nesbitt. He testified that he gave certain in-person orders to Lt. Shaw on dates that Lt. Shaw was not even physically present at VFA-106, but rather on leave. As an attempt to corroborate his testimony, the government provided a copy of, what was purported to be, Lt. Col. Nesbitt's personal diary that reflected certain dates he says he spoke with Lt. Shaw. The diary was directly sourced from Lt. Col. Nesbitt.

42. In the midst of the FNAEB, on or about October 11, 2018, Lt. Shaw was notified that his promotion to Lt. Cmdr. was being withheld.

43. The Senior Member of the FNAEB issued his final report on October 23, 2018, in which he recommended a Class B(1) classification, which would terminate Lt. Shaw's flight status while retaining his right to wear the insignia of a Naval Aviator.

44. On October 31, 2018, Lt. Shaw was provided a copy of the FNAEB report, along with a Report of Officer Misconduct which recommended that Lt. Shaw "show cause" for his retention in the Navy. Enclosed with the FNAEB report was a copy of Lt. Col. Nesbitt's journal.

45. On November 2, 2018, the CNAL SJA, Lt. Cmdr. Colberg, confirmed that the CDI was still considered "open," as it had not yet been approved or endorsed by the higher chain of command. This means all administrative and disciplinary action taken as a result of the CDI up to that point, to include the HFB, NJP, FNAEB, and Report of Officer Misconduct, were premature.

46. Lieutenant Shaw submitted a rebuttal to both the FNAEB report and Report of Officer Misconduct on November 14, 2018, with a request that Cmdr. Scott and Lt. Col. Nesbitt be recused from the decision making process as both individuals were under investigation by the DoD IG for whistleblower reprisal.

47. Despite the request for his recusal, Cmdr. Scott none the less endorsed both the Report of Officer Misconduct and the FNAEB Report, recommending that Lt. Shaw be "detached for cause," removed from the Fiscal Year 19 Lt. Cmdr. Promotion List, ordered to show cause for retention in the Navy, and that he receive a Class B(2) classification, which is termination of his flight status *and* revocation of his right to wear Naval Aviator wings–a more severe recommendation than the one provided by the FNAEB, and, upon best information and belief, possibly one of the most severe outcomes of all FNAEBs ever held in the Navy.

48. On November 19, 2018, a day *after* endorsing the FNAEB report, Cmdr. Scott endorsed the underlying retaliatory CDI, which had been pending his endorsement for three months.

49. Around the same time, Cmdr. Scott also "unfavorably" closed the incident report in JPAS, resulting in DoD CAF issuing a notice of proposed revocation of Lt. Shaw's security clearance nearly one year later, in October 2019.

50. On December 31, 2018, Lt. Shaw's Aviation Career Incentive Pay (ACIP), or "flight pay," was suspended in accordance with the FNAEB instruction governing Class B

recommendations. This resulted in Lt. Shaw being deprived of $650 in pay per month. In addition to the monthly pay cut, the suspension was backdated to October 23, 2018, the date of the FNAEB report, resulting in Lt. Shaw being indebted to the Navy for $801.67.

51. In January 2019, Cmdr. Scott also authored an adverse Fitness Report, documenting the alleged misconduct that had never been adjudicated.

52. Beginning in January 2019, there was constant coordination between Lt. Shaw's civilian attorney and Rear Adm. Kelley's office to meet with him regarding his endorsement of the FNAEB report. For nearly one year, Rear Adm. Kelley's office continuously delayed rendering a decision. This was, in part, due to the fact that the DoD IG investigation, which implicated many of the officers who had a hand in the FNAEB, was on going, as well as the on-going EO investigation initiated by Vice Adm. Miller.

53. In May 2019, Lt. Shaw was notified that he had not been selected for Aviation Department Head by the screening board–a necessary billet for any officer desiring to succeed in his or her Naval career.

**DoD IG Investigation: Substantiation of Whistleblower Reprisal.**

54. On June 12, 2019, the DoD IG informed Lt. Shaw that it had substantiated whistleblower reprisal against Lt. Shaw by Lt. Col. Nesbitt, Cmdr. Weyenberg, and Cmdr. Roberts. The DoD IG specifically found that the CDI had been initiated to "punish, harass, and ostracize" Lt. Shaw. The DoD IG recommended the Secretary of the Navy take appropriate action to remedy any harm to Lt. Shaw's career which resulted from the actions of these individuals.

55. As a result of these findings, on August 5, 2019, Lieutenant Colonel Nesbitt was relieved of his position as the XO of VFA-106.[2]

56. The very next day, August 6, 2019, Cmdr. Scott convened a "command climate" survey. From the concentration of comments focused solely on Lt. Shaw as well as the consistency of language within the various responses, it appears that those surveyed were instructed by the higher command to provide answers that were damning to Lt. Shaw. And, given the timing of this survey in close proximity to the Tailhook convention in September 2019, it appears that the survey was conducted as a means to garner "evidence" against Lt. Shaw and an attempt to subvert the DoD IG's findings.

57. The Tailhook Association Convention took place September 5-8, 2019. This convention is highly publicized and attended by many throughout the Naval fleet as well as retired Naval Aviators. Prior to a questions-and-answer panel conducted by several Flag Officers, to include Vice Adm. Miller and Rear Adm. Kelley, Vice Adm. Miller notified the panelists that there would be a question presented to the panel about an IG investigation and that Rear Adm. Kelley would be answering the question–in other words, a question was planted for specific purpose of being addressed by Rear Adm. Kelley. The question was posed by two IPs from VFA-106, Cmdr. Caponigro (VFA-106 Operations Officer who was serving as the XO following Lt. Col. Nesbitt's relief from command) and Lt. Cmdr. Scarbro (who also happened to have served as a member on Lt. Shaw's FNAEB); they asked the panel if the

---

[2] *See* https://www.navytimes.com/news/your-navy/2019/08/09/navy-fires-marine-xo-of-the-gladiators/ (last visited February 7, 2020). Lieutenant Colonel Nesbitt was then reinstated in September 2019; notwithstanding the Secretary of the Navy's affirmation of the DoD IG's finding of whistleblower retaliation, Lt. Col. Nesbitt continues to serve in this position and continues to instruct pilots. *See* https://www.navytimes.com/news/your-navy/2019/09/14/marines-clear-xo-fired-from-the-navys-gladiators/ (last visited February 7, 2020).

senior leadership in the Navy was doing anything to protect mid-level officers against junior officers who "weaponized" the IG against their bosses. Rear Admiral Kelley prefaced his response with, "That's a delicate question." He then stated that that the DoD IG is an "independent" organization, exclusive of the Navy "leadership" on the panel, and that unfortunately, the Navy cannot "change" the DoD IG's findings. The Navy leadership are concerned that someone "abused" the IG system (*i.e.*, Lt. Shaw), and that the Navy leadership are trying to see what preventions they can have the DoD IG put in place to ensure lower level individuals cannot abuse the IG system in the future.  Rear Admiral Kelley concluded his remarks by stating that the Navy itself will have to make sure that any internal investigations it conducts (such as the CDI into alleged misconduct by Lt. Shaw) are perfectly "clean." In other words, it matters not the intent behind a CDI; it only matters that they ensure it is "appellate proof" so that any allegation which is initiated as whistleblower retaliation cannot be overturned.

58. On December 16, 2019, Mr. Gregory Slavonic, Assistant Secretary of the Navy (Manpower and Reserve Affairs), by and through the direction of the Secretary of the Navy, and upon review of the DoD IG findings, invalidated the CDI, and ordered the following to occur: (1) Correct and/or remove any adverse or derogatory material that resulted from the invalid CDI; (2) no later than December 18, 2019, advise the DoD CAF that the CDI (which formed the basis for the incident report in JPAS, suspension of Lt. Shaw's access to classified information, and the recommendation for revocation of Lt. Shaw's security clearance) had been invalidated; and (3) Chief of Naval Personnel (CNP) must determine whether Lt. Shaw's professional or promotion opportunities may have been impacted as a result of

reprisal, retaliation, and restriction and, if so, CNP is ordered to take remedial action. All corrective action was ordered to be completed by February 14, 2020.

59. In the same correspondence, the Assistant Secretary authorized the convening of a second CDI into similar bases as the first CDI. This disposition was approved by the Secretary of the Navy in correspondence to Representative Elaine G. Luria of January 10, 2020, though then-Acting Secretary Modly made no mention of the second CDI to Representative Luria.

**Continued Retaliation.**

60. On or about the same day the Secretary authored his correspondence to Representative Luria, Adm. Grady initiated a second CDI into Lt. Shaw with nearly the *exact same* scope as the previous CDI: (1) whether Lt. Shaw, without authorization, recorded F/A-18 Tactical Operational Flight Trainer sessions; and (2) whether Lt. Shaw was conducting unauthorized training (such as Velocity Vector), or was otherwise outside the normal training phases. Upon best information and belief, the IO for this CDI, Captain (Capt.) Charles Hampton, U.S. Navy, served as the Executive Assistant to Defendant Adm. Grady. Upon best information and belief, Capt. Hampton had been utilizing his private and personal email to conduct the investigation and correspond with witnesses, and that Capt. Hampton has been ordered to disregard any exculpatory evidence from the previous investigation or obtained during this investigation.

61. Upon best information and belief, this second CDI was convened as deflection and to absolve the senior Navy leadership (*i.e.*, Rear Adm. Kelley, Vice Adm. Miller, and Adm. Grady) of knowingly permitting racial discrimination within the Navy. Each one of these three officers was involved with the EO investigations of the two African American SPs who were wrongfully discharged from F/A-18 training at VFA-106 due to racial bias and

discrimination. If Lt. Shaw can be deemed unsafe, then the senior Navy leadership are better able to justify unsubstantiating the allegations of racial discrimination in the respective EO investigation. Thus, the second CDI is not only retaliatory, but is being used to "clean up" other internal Navy investigations which have highlighted the systemic racial discrimination within the Navy's Aviation community, and specifically VFA-106.

62. On March 24, 2020,[3] Lt. Shaw appealed the Assistant Secretary's authorization to convene the second CDI. In accordance with 10 U.S.C. § 1034, the appeal was submitted to the Secretary of Defense. The Secretary of Defense is required to act on the appeal within 90 days. As of the date of this filing, Defendant Esper has failed to act on the appeal.

63. Upon best belief and information, the second CDI was stayed with the intent to allow the appeal process to proceed to conclusion. However, on or about June 29, 2020, Lt. Shaw learned the second CDI had resumed, on or about April 22, 2020, with a new IO and advising SJA (since the previous two individuals had been "reassigned"). Navy Capt. David Wroe was appointed as the new IO. The second CDI was ordered to be completed by July 15, 2020.

64. Since the inception of the original CDI, and in addition to the various adverse personnel and administrative actions he has suffered (despite those adverse actions having been ordered to be set aside), Lt. Shaw has been ostracized, treated like a criminal, and precluded from flying. He suffered grave reputational harm; given the small environment that is the active, retired, and former Naval aviation community, this reputational harm will continue to plague him even after he is able to leave the Navy.

---

[3] This is the date the physical copy of the appeal was delivered to the Office of the Secretary of Defense.

65. He has also been placed on legal hold, which has precluded him voluntarily leaving the Navy, despite the expiration of his service obligation. He continues to remain on legal hold due to the convening of the second CDI, which has not yet been finalized. Not only is he now being held past his end of obligation, but he is being precluded from resigning his commission–the only thing that would allow him some escape from this now-never-ending, vicious cycle of retaliation. Furthermore, the corrective action previously ordered by the Assistant Secretary has yet to be implemented–save the removal of two adverse fitness reports.

## FIRST CAUSE OF ACTION
### (Administrative Procedure Act)

### The Secretary of the Navy has unlawfully withheld and unreasonably delayed the corrective action.

66. All preceding paragraphs are incorporated by reference as though fully set forth herein.

67. The APA requires agencies to act on matters pending without unreasonable delay. Factors considered when determining whether there has been unreasonable delay include: (1) the length of delay; (2) the reasonableness of the delay compared to the context of the statute which authorizes the agency's action; and (3) the consequence of the delay.

68. The delay in this matter has been significant: 409 days have lapsed since the DoD IG substantiated the acts of whistleblower reprisal, 379 days have lapsed since the Secretary of the Navy was statutorily required to render a decision on corrective action, and 222 days have lapsed since the Assistant Secretary of the Navy issued the decision on the appropriate corrective action.

69. To put the unreasonableness of tis delay into context, the same two primary allegations being raised have already been considered and acted upon in 13 separate administrative and

disciplinary actions including a commanding officer's determination that these allegations
"do not meet prosecutorial merit." In contrast, Captain Crozier, former Commanding Officer
of the USS Theodore Roosevelt was twice investigated and adjudicated within the same time
frame that this ongoing appeal has been pending.

70. The corrective action ordered to be taken included, *inter alia*: (1) the correction or removal of
any adverse or derogatory material that resulted from the CDI; (2) notification to DoD CAF
that the CID had been invalidated; and (3) for the Chief of Naval Personnel to determine
whether Lt. Shaw's professional or promotion opportunities may have been impacted as a
result of the reprisal and, if so, to take remedial action. To date, the *only* remedial action that
has occurred, to Lt. Shaw's best belief and knowledge, was the removal of two adverse
fitness reports. All other ordered corrective action has yet to be taken. This in turn has had a
detrimental affect on Lt. Shaw. He continues to languish in the same holding pattern that he
has for the past two years, and without his rightful promotion.

71. When compared to the context of the statutory deadlines, this delay is unreasonable. The
MWPA is designed to protect any service member who makes a protected communication,
and restore any deprivation of rights or reverse administrative wrongs that occurred in
retaliation against the member for making the protected communication. The deadlines set
forth in this statute make clear that Congress intended for these reparations to occur in an
expedited fashion. The Service Secretaries only have 30 days from the date of finding of
substantiated whistleblower retaliation to make a decision on the corrective actions and to
implement those actions; as previously discussed, 379 days have now lapsed since the
Secretary of the Navy was required to implement the action and 222 days have lapsed since
the Assistant Secretary of the Navy ordered the corrective action. This delay is unreasonable.

72. Most critical to this Court's determination in this matter, though, is the consequences of the Secretary's delay. As discussed above, Lt. Shaw's circumstance remains unchanged as if no substantiation of whistleblower reprisal ever occurred, unable to serve and unable to move on with his life. Thus, the delay is unreasonable.

73. Accordingly, because the Secretary of the Navy's failure to implement the corrective action has resulted in unreasonable delay, this Court must mandate the Secretary of the Navy to implement the requisite corrective action.

## SECOND CAUSE OF ACTION
## (Administrative Procedure Act)

### The Secretary of the Defense's decision on Lt. Shaw's appeal has been withheld and unreasonably delayed.

74. All preceding paragraphs are incorporated by reference as though fully set forth herein.

75. The APA requires agencies to act on matters pending without unreasonable delay. Factors considered when determining whether there has been unreasonable delay include: (1) the length of delay; (2) the reasonableness of the delay compared to the context of the statute which authorizes the agency's action; and (3) the consequence of the delay.

76. The delay in this matter has been significant; the DoD IG's substantiation of whistleblower reprisal occurred on June 12, 2019. Once an allegation of whistleblower reprisal has been substantiated, the Service Secretary has 30 days to determine whether corrective action should be taken, and then take such action. The Secretary of the Navy did not comply with this statutory mandate; 222 days lapsed before the Assistant Secretary of the Navy rendered his decision. If a service member disagrees with the Service Secretary's decision, he may appeal the matter to the Secretary of Defense, who shall act on the appeal within 90 days. Now, 123 days have lapsed since the Secretary of the Defense received the most recent

appeal for action. That is 33 days in excess of the statutory deadline.

77. When compared to the context of the statutory deadlines, this delay is unreasonable. The MWPA is designed to protect any service member who makes a protected communication, and restore any deprivation of rights or reverse administrative wrongs that occurred in retaliation against the member for making the protected communication. The deadlines set forth in this statute make clear that Congress intended for these reparations to occur in an expedited fashion. The Service Secretaries only have 30 days from the date of finding of substantiated whistleblower retaliation to make a decision on the corrective actions and to implement those actions; if the Service Secretary denies any corrective action and the service member appeals, the Secretary of Defense then only has 90 days to act on the appeal. In sum, this entire process is designed to take approximately 120 days. In Lt. Shaw's case, the Secretaries'–of both the Navy and Defense–decisions on the substantiated whistleblower retaliation have been pending for a combined total of 409 days (well over one year). When compared with the unambiguous intent of the statutory framework, the delay in this case has been unreasonable.

78. Moreover, current circumstances in the military–specifically, recognition by one or more military branch that there has been racial inequality in certain areas, including military justice–warrant consideration. On June 3, 2020, 71 days after Lt. Shaw's appeal was submitted, Dr. Esper was quoted as saying:

> Racism is real in America, and we must all do our very best to recognize it, to confront it, and to eradicate it. I've always been proud to be a member of an institution – the United States military – that embraces diversity and inclusion and prohibits hate and discrimination in all forms.
>
> More often than not, we have led on these issues. And while we

still have much to do on this front, leaders across DOD and the
services take this responsibility seriously, and we are determined to
make a difference.[4]

79. Since then, Dr. Esper has directed a six-month long "Defense Board on Diversity and

Inclusion," and announced as recently as last week more than nine DoD-wide initiatives to

combat racism in the military.[5] All the while, the clear and straightforward determination to

stop the continued reprisal against Lt. Shaw through the ongoing investigation has been left

untouched. It is difficult to ignore the contradicting and hypocritical message being sent that

at once, Dr. Esper takes seriously the matter of racism in the military, but at the same time

allows blatant unlawful retaliation against any individual who attempts to report or stand

against such racism. His current efforts and initiatives are immediately undermined by his

failure to act in a timely manner regarding Lt. Shaw's appeal. Most critical to this Court's

determination in this matter, though, is the consequences of the Secretary's delay. The crux

of Lt. Shaw's appeal to the Secretary of Defense was that there had been a finding of

substantiated whistleblower retaliation–the Assistant Secretary of the Navy recognized as

much when he ordered corrective action–but that the decision to authorize a second CDI both

constituted continued whistleblower retaliation–and was outside the scope of the Assistant

Secretary of the Navy's authority under the MWPA. Thus, while the appeal continues to

languish, Lt. Shaw continues to be under a renewed investigation that is nearly identical to

the one that was deemed to have been retaliatory. When the agency's inaction amounts to the

same injury as a denial, the delay must be considered unreasonable. The Navy allowing the

---

[4]*See* https://www.defense.gov/Newsroom/Transcripts/Transcript/Article/2206685/secretary-of-
defense-esper-addresses-reporters-regarding-civil-unrest/ (last visited July 23, 2020).
[5] *See* https://connectingvets.radio.com/articles/esper-announces-immediate-actions-against-
racism-in-military (last visited July 23, 2020).

second CDI to continue while this appeal is being processed has the same effect as though it were denied, and essentially nullifies the due process intended by the option to appeal under 10 U.S.C. § 1034 in the first place. Thus, the delay is unreasonable.

80. Accordingly, because the Secretary of Defense's failure to render a decision on the appeal has resulted in unreasonable delay, this Court must mandate the Secretary of Defense to issue a decision.

### THIRD CAUSE OF ACTION
### (Administrative Procedure Act)

### The Secretary of the Navy's authorization to proceed with the second CDI absent final action by the Secretary of Defense on the appeal constitutes continued reprisal and is contrary to legally required procedures.

81. All preceding paragraphs are incorporated by reference as though fully set forth herein.

82. The APA authorizes reviewing courts to hold unlawful and set aside agency action that is either contrary to constitutional rights or without observance of procedure required by law.

83. Defendant Braithwaite's authorization of the second CDI to continue absent final decision by Defendant Esper on the pending appeal is a violation of Lt. Shaw's constitutional right to Due Process and contrary to procedures required by law.

84. The MWPA affords a service member certain administrative appellate rights following the Service Secretary's issuance of a decision. Specifically, if a service member disagrees with the Service Secretary's decision, then the only other avenue for appellate review is submission of the matter to the Secretary of Defense. 10 U.S.C. § 1034(h).

85. Inherently, this congressionally created administrative right contemplates that any action directed by the Service Secretary with which the service member disagrees will not be acted upon until the Secretary of Defense has a chance to review the action.

86. Here, not only has Defendant Braithwaite disregarded this legally required procedure, but in so doing, has also engaged in continued retaliation and reprisal against Lt. Shaw. This Second CDI serves no legitimate government purpose.  Its scope is purportedly restricted to the same two allegations.  A determination has already been made that these same alleged charges did not sustain the low standard for referral of charges (reasonable cause) to a court martial and administratively the charges are barred by the statute of limitations and he has already been notified to show cause why he should remain in the service, albeit entirely as a result of reprisal activity.  Consequently, no additional administrative actions can be levied upon Lt Shaw.  Given that this is a criminal investigation there appears to be no valid end state to achieve from its conduct other than the purpose to harass, punish, and stigmatize him. This continued retaliation and reprisal, which Lt. Shaw has been suffering under for the past two years, is nothing short of prejudicial.

87. Accordingly, this Court should find that Defendant Braithwaite authorizing the second CDI to continue while the appeal to the Secretary of Defense remains pending is contrary to legally required procedures and therefore unlawful.

### **RELIEF**

Wherefore, Lt. Shaw prays that this Honorable Court conduct a speedy hearing and direct the following relief:

1. Direct the Secretary of the Navy to implement all previous corrective actions, to include the following non-exhaustive list:

   a. Promotion to the rank of Lt. Cmdr., backdated to September 2019, along with all appropriate back pay;

   b. Full selection status as a department head;

c.   Restoration of flight status and pilot currency;

d.   Full Back pay of ACIP beginning October 23, 2018; and

e.   Retraction of the derogatory VFA-106 Hazard Report (HAZREP) dated

September 10, 2018;

2.   Direct the Secretary of Defense to act on the appeal;

3.   Set aside the current second CDI;

4.   That Lt. Shaw be awarded the costs and reasonable attorney's fees incurred in

bringing this action, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412

and the Privacy Act, 5 U.S.C. § 552a; and

5.   Such other relief as may be deemed necessary or appropriate in order to accord full

and complete relief.

Respectfully submitted,


    */s/ Eric. S. Montalvo*
Eric S. Montalvo, DC Bar No. 993206
THE FEDERAL PRACTICE GROUP
1750 K Street N.W., Suite 900
Washington, D.C.  20006
Telephone:     (202)862-4360
Facsimile:      (888)899-6053
emontalvo@fedpractice.com


Dated: July 25, 2020                    /s/ *William R. Cowden*
William R. Cowden
DC Bar #426301
WILLIAM COWDEN LLC
1750 K Street, N.W., Suite 900
Washington, DC 20006
(202) 808-3140 (office) / (888) 899-6053 (fax)
wcowden@cowdenllc.com

*Counsel for Plaintiff*