**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| STEVEN E. SHAW, |
| *Plaintiff*, |
| v. |
| LLOYD J. AUSTIN III *et al.*, |
| *Defendants*. |

Civil Action No. 20-2036 (RDM)

**MEMORANDUM OPINION AND ORDER**

Plaintiff Lieutenant Steven E. Shaw is a fighter pilot instructor in the Navy.  In 2017, Plaintiff helped two Black student pilots file whistleblower complaints alleging racial discrimination in the fighter pilot training program.  Later the same year, Plaintiff filed a whistleblower complaint of his own, alleging that instructor pilots had been illicitly betting bottles of liquor with student pilots.  Thereafter, Plaintiff's commanding officers opened an investigation of Plaintiff that ultimately recommended his separation from the armed forces.  The Assistant Secretary of the Navy, acting on an Inspector General's report finding that the investigation of Plaintiff constituted unlawful whistleblower retaliation, vacated that finding, but he left open the possibility of a renewed investigation.  Plaintiff appealed to the Secretary of Defense, arguing that any follow-on investigation would necessarily be retaliatory and therefore invalid.  Meanwhile, the Commander of U.S. Fleet Forces Command opened a second investigation of Plaintiff.  Plaintiff then filed this lawsuit to challenge what he asserted was a continuing pattern of retaliation against him.

While this case has been pending, the Executive Director of the Office of the Under Secretary of Defense for Personnel and Readiness ("Executive Director"), who was designated to

1

act on behalf of the Secretary of Defense, denied Plaintiff's appeal on the grounds that the Assistant Secretary of the Navy had authority to allow the second investigation.  And Fleet Forces Command completed its second investigation, concluding that Plaintiff taught unapproved landing techniques.  Later today, May 1, 2021, Fleet Forces Command will issue a Report of Misconduct again recommending that Plaintiff be separated from the Navy for cause. To avoid that result, Plaintiff has now filed a motion for preliminary injunction seeking to prevent the issuance of the Report of Misconduct.  For the following reasons, the Court will **DENY** that motion.

## I.  BACKGROUND

Plaintiff is an active-duty Lieutenant in the Navy.  Dkt. 28 at 3, 7 (Am. Compl. ¶¶ 1, 13).[1] In October 2016, he transferred to Strike Fighter Squadron 106 ("VFA-106"), based at Naval Air Station Oceana in Virginia, where he served as an F/A-18 fighter pilot instructor.  *Id.* at 4, 7 (Am. Compl. ¶¶ 8, 13).  The next year, Plaintiff engaged in two instances of what the Navy later recognized as protected whistleblower activity.  First, Plaintiff supported two Black student pilots in the filing of equal opportunity complaints, in addition to correspondence with Congress, alleging racial discrimination in the fighter-pilot training program.  *Id.* at 7 (Am. Compl. ¶ 14). Second, Plaintiff lodged complaints with the office of Senator Mark Warner and the Naval Inspector General regarding "bottle bets," which were wagers between pilot instructors and their students related to student performance in training exercises.  *Id.* at 7–9 (Am. Compl. ¶¶ 15–18). As the name suggests, the stakes of the bets were bottles of alcohol, and students who did not perform well enough in training were required to buy liquor for their teachers.  *Id.* at 8 (Am.

---

[1]  Because the Court denies injunctive relief, and for convenience at this early stage of the litigation, the Court gives Plaintiff the benefit of the doubt and assumes the truth of the allegations in his complaint for the purpose of setting forth the background.

Compl. ¶ 15).  Plaintiff asserted that bottle bets constituted illegal gambling activity, contributed to a frat-like culture of alcohol consumption, and incentivized instructors to give their students artificially low marks, in order to maximize the amount of liquor owed.  *Id.*  After Plaintiff's complaints, the Navy put an end to the practice of bottle bets.  *Id.* at 9 (Am. Compl. ¶ 19).

Following the termination of bottle bets and a press report on the allegations of racial discrimination, several high-ranking officers expressed their displeasure with Plaintiff's whistleblower activity, including by allegedly stating their intention to "destroy" his career.  *Id.* at 10 (Am. Compl. ¶¶ 20–22).  These officers opened what is known as a Command Directed Investigation against Plaintiff and appointed Commander Bryan Roberts, who had previously defended bottle bets as a proud Navy tradition and referred to Plaintiff as a "malcontent," to serve as the investigating officer.  *Id.* at 10, 14 (Am. Compl. ¶¶ 21, 31).  In an email, Commander Roberts explained that he had been appointed because he was "willing to kamikaze" Plaintiff.  *Id.* at 14 (Am. Compl. ¶ 32).  At the end of the lengthy investigative process, which spanned months and involved the chain of command taking several other administrative actions against Plaintiff, *id.* at 15–20 (Am. Compl. ¶¶ 33–47), the commanding officer of VFA-106 recommended that Plaintiff be detached for cause and ordered to show cause for retention in the Navy, *id.* at 20 (Am. Compl. ¶ 48).

The results of the first investigation against Plaintiff, however, were overturned.  On June 12, 2019, the Department of Defense's Inspector General released a report finding "several instances of reprisal, retaliation[,] and restriction directed at [Plaintiff]."  Dkt. 24-1 at 2 (Ex. 1).[2]

---

[2]  The parties initially submitted portions of the administrative record as exhibits to their briefs. On May 28, 2021, after the close of briefing on the motion for preliminary injunction, Defendants then filed the full certified administrative record under seal.  Dkt. 30.  For convenience, and given the need to resolve the pending motion quickly, the Court cites to the exhibits in this opinion, but all of the cited documents also appear in the administrative record.

In particular, the report found that the commanding officer of VFA-106 at the time of the investigation, Commander Martin Weyenberg, and the executive officer of VFA-106 at the time of the investigation, Lieutenant Colonel Michael Nesbitt, "[r]equested and initiated a retaliatory investigation of [Plaintiff]" and that Commander Roberts "[c]onducted the retaliatory investigation." *Id.* In light of that report, on December 16, 2019, the Assistant Secretary of the Navy for Manpower and Reserve Affairs entered an order vacating the results of the first investigation. *Id.* at 3. The Assistant Secretary found that the investigation "is invalid because it was ordered for a retaliatory purpose and was conducted in a retaliatory manner" and therefore "any action taken against [Plaintiff] which uses the [investigation] as the basis, in whole or in part, for such actions is invalid." *Id.*

Based on these findings, the Assistant Secretary ordered U.S. Fleet Forces Command to take several remedial actions. He directed Fleet Forces Command to "[c]orrect and/or remove any adverse or derogatory material the resulted from" the investigation, including certain fitness reports, from Plaintiff's personnel file. *Id.* The order also directed Fleet Forces Command to notify the Department of Defense Consolidated Adjudications Facility that the investigation, which formed the basis for the suspension of Plaintiff's security clearance, had been invalidated. *Id.* Further, the Assistant Secretary ordered the Chief of Naval Personnel to "determine whether [Plaintiff's] professional or promotion opportunities may have been impacted as a result of reprisal, retaliation[,] and restriction," and if so, to "take remedial action." *Id.* at 4.

The order, however, stopped short of forbidding a second investigation of Plaintiff, although the Assistant Secretary placed procedural and substantive constraints on any such investigation. *Id.* at 3. Any follow-on investigation was to be ordered directly by Fleet Forces Command and conducted by an officer assigned to Fleet Forces Command, rather than anyone

from VFA-106.  *Id.*  Witnesses were to be "informed that any previous statements made by them for the purposes of the [first investigation] will not be used" in the second investigation.  *Id.* Substantively, any renewed investigation could "inquire into" only two issues: (1) "[w]hether [Plaintiff], without authorization, recorded F/A-18 . . . training sessions" and (2) "[w]hether [Plaintiff] was conducting unauthorized training (such as Velocity Vector), or was otherwise training outside of phase."  *Id.*  The Assistant Secretary ordered that all corrective actions were to "be completed within 60 days of the date of" his order.  *Id.* at 4.

In early 2020, Admiral Christopher Grady, the Commander of U.S. Fleet Forces Command, launched a second investigation of Plaintiff, focused on the two questions that the Assistant Secretary's order had left open.  Dkt. 28 at 24–25 (Am. Compl. ¶¶ 62–63).  On March 20, 2020, Plaintiff appealed the Assistant Secretary of the Navy's authorization of a second investigation to the Secretary of Defense.  *Id.* at 25–26 (Am. Compl. ¶ 66).  On July 14, 2021, the officer assigned to the second investigation issued his report to Admiral Grady.  Dkt. 25-1 at 2 (Ex. 2) (Sealed).  The investigator found that the first allegation, related to recording training sessions, was not substantiated, but the second allegation, related to unauthorized training or training out of phase, was substantiated.  *Id.* at 4.

On July 25, 2020, Plaintiff filed this lawsuit, asserting three causes of action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.  Dkt. 1.  His original complaint challenged the Navy's delay in implementing the corrective actions that the Assistant Secretary ordered, *id.* at 23–25 (Compl. ¶¶ 66–73), and the Secretary of Defense's delay in adjudicating his administrative appeal, *id.* at 25–28 (Compl. ¶¶ 74–80).  He also asserted that the second investigation could not lawfully proceed while his administrative appeal was still pending.  *Id.* at 28–29 (Compl. ¶¶ 81–87).  At that point, three separate adjudicative processes were proceeding

in tandem: the second investigation, Plaintiff's administrative appeal of the order vacating the

first investigation but permitting the second investigation, and this lawsuit.

While the parties litigated this case, the administrative process continued.  On September

8, 2020, Admiral Grady issued a final endorsement of the investigator's report from the second

investigation.  *See* Dkt. 25-2 (Ex. 3) (Sealed).  Based on that endorsement, on September 18,

2020, Admiral Grady completed a Report of Misconduct.  Dkt. 25-3 (Ex. 4) (Sealed).  In the

Report, Admiral Grady concludes, based on the results of the second investigation, that Plaintiff

violated two provisions of the Uniform Code of Military Justice—Article 92 for dereliction of

duty and Article 133 for conduct unbecoming an officer—by allegedly teaching unauthorized

and potentially dangerous landing techniques.  *Id.* at 2.  Based on this finding, Admiral Grady

"direct[s], request[s], and recommend[s]" several administrative actions.  *Id.* at 3.  He "direct[s]

that [Plaintiff] be required to show cause for retention in the naval service;" "request[s] that

[Plaintiff] be detached for cause;" and "recommend[s] that [Plaintiff] be removed from"

consideration for promotion.  *Id.*  The Report of Misconduct notifies Plaintiff that he has the

right "to submit comments within 10 working days of receipt concerning this report, which will

be included as adverse matter in his official record."  *Id.*  Although the Report of Misconduct is

addressed to the Commander of Navy Personnel Command and is dated September 18, 2020, *id.*

at 2, Admiral Grady has not yet transmitted the report, as part of an informal agreement reached

as part of this litigation, *see* Dkt. 14 at 1; Dkt. 24 at 21.  Defendants also represent that they are

still willing to accept comments from Plaintiff as to the Report of Misconduct.  *Id.* at 20 n.8.

Fleet Forces Command intends to issue the Report of Misconduct later today, May 1, 2021.  Dkt.

14 at 1; Dkt. 24 at 21.

Once the Report of Misconduct is transmitted, Navy policies require several additional steps before Plaintiff could be separated for cause from the armed forces.  When U.S. Fleet Forces Command initiates an investigation that results in a Report of Misconduct, that report then goes to the show-cause authority, which is the Deputy Chief of Navy Personnel.  Navy Military Personnel Manual 1611-010, *Officer Performance and Separations for Cause*, § 2(a)(2) (Oct. 30, 2019) ("Personnel Manual 1611-010").  Although the Report of Misconduct in Plaintiff's case "direct[s]" him to show cause, Dkt. 25-3 at 3 (Ex. 4) (Sealed), Defendants assert that the Navy Personnel Command has discretion to decide whether requiring the officer to show cause is warranted and, if not, to "close[] the case," Dkt. 24 at 14.  Even assuming that Plaintiff will be required to show cause, however, he will have "rights and options, which will include the option to present his case before a Board of Inquiry."  *Id.* at 13.  A Board of Inquiry is a hearing before a panel of three senior military officers in which the Navy bears the burden of proving by preponderance of the evidence that the respondent should be recommended for separation.  *See generally* Sec'y of the Navy Instruction 1920.6D, Enclosure 11, *Board of Inquiry Procedures* (July 24, 2019), https://www.secnav.navy.mil/doni/Directives/01000%20Military%20Personnel%20Support/01-900%20Military%20Separation%20Services/1920.6D.pdf.  At the hearing, the respondent has a right to counsel and may review evidence and cross-examine witnesses.  *Id.*

Only if the Board of Inquiry recommends separation would the case then go to the Assistant Secretary of the Navy, to whom the Secretary of the Navy has delegated authority to order separation of officers, for final decision.  Personnel Manual 1611-010 § 2(b)(2). "Separation is the final decision made in an officer misconduct or substandard performance case determining whether an officer must be involuntarily discharged or retained."  *Id.* § 2(b)(1).  In

7

sum, as Defendants point out, before a final separation order is entered, "the officer is provided multiple opportunities to comment and be heard," including an opportunity to show cause why he should not be removed.  Dkt. 24 at 12; *see also* Personnel Manual 1611-010 § 4(d).  The remainder of the process, however, is on hold pending transmission of the Report of Misconduct.

Meanwhile, the Executive Director, who was designated to act on behalf of the Secretary of Defense, issued a "final" decision on Plaintiff's administrative appeal, in which he had challenged the Assistant Secretary of the Navy's authorization of a second investigation while also seeking to enforce the other remedial actions that the Assistant Secretary had ordered.  Dkt. 24-2 at 2–3 (Ex. 5).  After setting forth the procedural history of Plaintiff's case, the Executive Director provided the following two paragraphs of analysis in denying Plaintiff's appeal:

> I have carefully considered the materials you submitted.  Based on my review, I find the actions directed by the Assistant Secretary have been effectuated with the exception of one corrective item, concerning your client's promotion delay, which remains outstanding.  The Chief of Naval Personnel determined the promotion was delayed due to the original CDI.  However, the delay remains in place since a second investigation was ordered and has not been finalized.  Since the outcome of the second CDI could influence the resolution of this matter, the Assistant Secretary reasonably allowed correction of the promotion delay to remain pending.
>
> I also find the Assistant Secretary has the authority to allow the second investigation to be conducted, and his actions do not constitute unlawful command influence.  At this time, there is no justification to set aside the second investigation.  As to your client's new allegation of retaliation related to the second investigation, [the Department of Defense Office of Inspector General] is responsible for investigating or overseeing investigations of allegations of restriction or reprisal; as such, [the Inspector General] is the proper authority to review this allegation and decide whether further investigation is warranted.  Accordingly, I have forwarded this new allegation of retaliation to [the Inspector General] for review and appropriate action.

*Id.* at 3.

In light of these intervening administrative actions, Plaintiff filed his currently operative "Combined Petition for Writ of Habeas Corpus and [] First Amended and Supplemental

Complaint." Dkt. 28.  The amended complaint includes six claims, challenging several distinct administrative actions or inactions.  First, Plaintiff seeks a writ of habeas corpus directing the Navy to end his "detention" in the armed forces by vacating his "legal hold" status and permitting him to "escape" further administrative "reprisal" and "punish[ment]" by retiring.  Dkt. 28 at 31–38 (Am. Compl. ¶¶ 76–91).  Second, he challenges the Secretary of the Navy's delay in implementing the corrective action that the Assistant Secretary ordered.  *Id.* at 39–41 (Am. Compl. ¶¶ 92–100).  Third, he challenges the Executive Director's decision not to halt the second investigation, on the grounds that the decision was arbitrary, capricious, and an abuse of discretion.  *Id.* at 41–45 (Am. Compl. ¶¶ 101–11).  In the fourth through sixth counts, Plaintiff alleges that the second investigation, as allowed to continue by the Executive Director, violated his rights under the First and Fifth Amendments to the Constitution.  *Id.* at 45–49 (Am. Compl. ¶¶ 112–28).

On April 12, 2021, Plaintiff filed his motion for preliminary injunction.  Dkt. 20.  He asks the Court to enjoin the issuance of the Report of Misconduct later today, May 1, 2021.  Dkt. 20-1 at 1–2.  Although Plaintiff knew no later than March 1, 2021, that Defendants planned to issue the Report of Misconduct on May 1, 2021, he waited more than a month to file his motion for preliminary injunction.  Defendants oppose the motion.  Dkt. 24.  The Court held a hearing on the motion on April 29, 2021.  Minute Entry (April 29, 2021).  The motion is now ripe for decision.

## II. LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), but "only when the party seeking the relief, by a clear showing, carries the burden of persuasion," *Cobell v. Norton*, 391 F.3d 251, 258 (D.C.

Cir. 2004).  To secure a preliminary injunction, a plaintiff "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  *Winter*, 555 U.S. at 20.  The first factor is the "most important."  *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014).

Before the Supreme Court's decision in *Winter*, the D.C. Circuit applied a "sliding-scale" approach to the preliminary injunction analysis under which "a strong showing on one factor could make up for a weaker showing on another."  *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011).  Since *Winter*, however, the court of appeals has hinted on several occasions "'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.'"  *Id.* at 393 (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring)); *see also Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018) (observing that *Winter* may be "properly read to suggest a 'sliding scale' approach to weighing the four factors be abandoned").  But it has repeatedly declined to decide the issue.  *See, e.g.*, *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016); *Am. Meat Inst. v. U.S. Dep't of Agric.*, 746 F.3d 1065, 1074 (D.C. Cir. 2014), *reinstated in relevant part by* 760 F.3d 18 (D.C. Cir. 2014) (en banc); *Sherley*, 644 F.3d at 393.

### III. ANALYSIS

In their briefing on the motion for preliminary injunction, the parties at times conflate Plaintiff's separate challenges to distinct administrative actions.  Because of this imprecision, the parties' arguments go past each other without joining issue.  To avoid confusion, the Court pauses to clarify the scope of its present inquiry.

As an initial matter, Plaintiff seeks a preliminary injunction to "stop the Navy from continuing to pursue the Report of Misconduct" during the pendency of this litigation.  Dkt. 29 at 9.  Plaintiff does not seek preliminary relief ordering Defendants to release him from the Navy or ordering Defendants to implement the corrective action that Plaintiff alleges they unlawfully withheld.  As such, resolving the pending motion does not require consideration of the first two counts in Plaintiff's complaint.

Next, although Defendants devote much of their opposition brief to arguing that the ongoing process related to the second investigation is constitutionally unripe for judicial review and does not constitute reviewable final agency action within the meaning of the APA, Plaintiff in his reply brief clarifies that he is not challenging the second investigation—at least not directly.  Rather, Plaintiff contends that "[t]he agency action in question here is the [Executive Director's] decision" on his administrative appeal.  *Id.*  Plaintiff argues that her decision was arbitrary and capricious and in violation of his constitutional rights, in part because the decision permitted the second investigation to proceed.  *Id.*

The Court agrees with Plaintiff that his challenge to the Executive Director's decision not to terminate the second investigation is distinct from any direct challenge to the second investigation.  And the Court further concludes—as Defendants do not contest—that the Executive Director's order constitutes final agency action and that Plaintiff has exhausted his administrative remedies with respect to that order.  Following the first investigation, Plaintiff filed an Inspector General complaint, the results of which formed the basis for the Assistant Secretary of the Navy's order requiring corrective action but declining to prohibit a second investigation.  Plaintiff appealed that latter aspect of the Assistant Secretary's order to the Office of the Under Secretary of Defense for Personnel and Readiness.  When the Executive Director of

that Office denied Plaintiff's appeal, her order by its own terms was the Department of Defense's "final" word on whether the relief granted to Plaintiff based on his successful challenge to the first investigation should include prohibiting a second investigation.  Dkt. 24-2 at 3 (Ex. 5).

That said, Plaintiff's decision to challenge only the Executive Director's order but not the second investigation directly has consequences for the scope of review.  Namely, in order to show a likelihood of success on the merits, Plaintiff must establish that the Executive Director's order permitting the second investigation to proceed violated the APA, either because it was arbitrary and capricious or because it infringed on his constitutional rights.  *Id.*  He cannot rely on flaws in the second investigation itself, however, unless those flaws relate to the propriety of the Executive Director's decision not to stop the investigation.

With this understanding of the question presented in mind, the Court turns to the preliminary injunction factors.

## A.      Likelihood of Success on the Merits

Plaintiff first argues that the Executive Director's decision to allow the second investigation to continue was arbitrary and capricious in violation of the APA.  The APA requires "reasoned decisionmaking."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983).  The Court must, accordingly, assess whether the Executive Director considered "the relevant factors and whether there has been a clear error of judgment." *Id.* at 43 (quotation marks omitted); *see also Judulang v. Holder*, 565 U.S. 42, 53 (2011).  "The scope of review under the 'arbitrary and capricious' standard," however, "is narrow," and the Court must not "substitute its judgment for that of the agency."  *State Farm*, 463 U.S. at 43.  Rather, the Court must "presume[ ] the validity of agency action."  *AT&T Corp. v. FCC*, 349 F.3d 692, 698 (D.C. Cir. 2003).  All that the APA requires is that "the process by which [an

agency] reaches [its] result [is] logical and rational." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998).  The Court must uphold the Executive Director's decision so long as she "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007) (quotation marks omitted).  In making this assessment, moreover, the Court must bear in mind that an agency's decision need not "be a model of analytic precision to survive a challenge;" rather, "[a] reviewing court will 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404 (D.C. Cir. 1995) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974)).

It is at least possible that Plaintiff will ultimately prevail on his claim that the Executive Director's decision was arbitrary and capricious.  The Executive Director concluded that "the Assistant Secretary has the authority to allow the second investigation to be conducted, and his actions do not constitute unlawful command influence."  Dkt. 24-2 at 3.  Plaintiff could conceivably argue that the Executive Director's reasoning is so conclusory that her decision-making path is not readily discernable.  *Id.*  The Court need not consider the strength of that argument now, however, because Plaintiff has not made any such argument, and thus Defendants have not had an opportunity to respond.

Rather, based on the arguments Plaintiff has actually presented to the Court, he has failed to carry his burden of showing a likelihood of success.  His briefs do not make clear on what grounds Plaintiff alleges the Executive Director's reasoning was flawed, and, at oral argument, his counsel was unable to clarify Plaintiff's theory on the merits.  In a disjointed passage of his brief that is difficult to parse, Plaintiff asserts:

> The Secretary of Defense [acting through the Executive Director] in an abuse of his discretion, *inter alia*, by failing to understand or consider the nature of the whistleblower reprisal appeal; unreasonably delayed the review so that the appealed investigation could be concluded and relied upon; considering an investigation the conduct of which should not have occurred yet given the purpose of the appeal; abdicating his statutory mandate to resolve the continuing reprisal concerns; disregarding the evidence submitted which demonstrated the basis for the allegation of reprisal; reliance on an incomplete investigation; reliance on incorrect information; and reliance on false information.

Dkt. 20-1 at 19.

Plaintiff provides no further explanation for most of these allegations. He does not say what "incorrect" or "false" information the Executive Director purportedly relied on in making her decision. At oral argument, Plaintiff's counsel argued that the second investigation relied on false evidence, but he did not suggest that the Executive Director considered that same evidence, much less relied on it. Similarly, Plaintiff does not say what evidence the Executive Director improperly disregarded. Nor does he explain in what way she failed to understand the nature of the appeal, and the portion of her decision setting forth the procedural history of the case undermines any notion that she did not understand that she was deciding an appeal of the Assistant Secretary of the Navy's order under the Military Whistleblower Protection Act. Dkt. 24-2 at 2 (Ex. 5).

Plaintiff's argument that the Executive Director improperly relied on the second investigation is also perplexing. She did not rely on the existence of the second investigation in deciding that the Assistant Secretary had authority to allow the second investigation to proceed. Nor did she blindly accept the propriety of the second investigation. To the contrary, she merely concluded that a new allegation that the second investigation was retaliatory is separate from Plaintiff's earlier allegations about the first investigation and should therefore be reviewed by the Department of Defense Office of Inspector General in the first instance. On that basis, the Executive Director "forwarded this new allegation of retaliation to [the Inspector General] for

review and appropriate action." *Id.* at 3.  The Executive Director thus did not assume the validity of the second investigation, but rather simply concluded that the Assistant Secretary of the Navy was not required to prohibit such an investigation.

To be sure, the Executive Director did rely on the second investigation in at least one respect: she concluded that the corrective action of considering Plaintiff for a promotion could be delayed until after resolution of the second investigation, the outcome of which might have implications for whether Plaintiff earns a promotion.  *Id.* at 3.  But, as noted above, Plaintiff does not seek a preliminary injunction requiring the Navy to consider him for a promotion without delay.  And, in any event, in the absence of any independent reason to question the Executive Director's decision that the second investigation could go forward, she acted reasonably in concluding that it would be more efficient to hold off on considering a promotion for Plaintiff until after resolution of whether Plaintiff would be separated from the armed forces.

Plaintiff does elaborate slightly on his claim that the Executive Director "abdicat[ed] [the Secretary's] statutory mandate to resolve the continuing reprisal concerns."  Dkt. 20-1 at 19. Plaintiff points out that the Military Whistleblower Protection Act prohibits retaliation based on protected whistleblower activity and requires the secretaries of the military departments, in cases in which an inspector general substantiates allegations of such retaliation, to "order such action as is necessary to correct the record of the personnel action prohibited" under the Act.  10 U.S.C. § 1034(f)(2)(A).  The Act also provides for appeals to the Secretary of Defense, who "shall make a decision to reverse or uphold the decision of the Secretary of the military department concerned in the matter within 90 days after receipt of such a submittal."  *Id.* § 1034(h).  But Plaintiff's argument stops at reciting the statutory text.  He does not explain how the Executive Director, acting on behalf of the Secretary of Defense, violated that provision.  She did "make a

decision." *Id.* To be sure, that decision came after the 90-day statutory deadline had passed, but any challenge to her delay is now moot, given that the decision has been issued. As for a potential substantive challenge to the merits of the decision, Plaintiff has not explained on what grounds the decision violated the statute, and it is not the Court's job to imagine what arguments he could possibly make. A preliminary injunction is an extraordinary remedy, which requires far more than unsupported assertions. Plaintiff has, in short, failed to meet his burden of showing a likelihood of success on the merits of his claim that the Executive Director's decision was arbitrary and capricious.

Plaintiff's motion suffers from similar defects with respect to his constitutional claims. His memorandum in support of his motion mentions the First Amendment only in setting forth the legal standard, Dkt. 20-1 at 16–17, and the section of his brief addressing the likelihood of success on the merits makes no reference to the First Amendment, *id.* at 19–22. In his reply brief, Plaintiff mentions the First Amendment briefly in arguing that he will suffer irreparable harm in the absence of an injunction, Dkt. 29 at 24, but he again makes no reference to his speech rights in analyzing the merits, *id.* at 12–21. Plaintiff cannot carry his burden of demonstrating a likelihood of success on the merits of his First Amendment claim without mentioning that claim.

In any event, Plaintiff's First Amendment claim is principally directed at the investigations, not the Executive Director's decision on his appeal. In his complaint, Plaintiff alleges that the first and second investigations constitute "a continuing effort to target [Plaintiff] for him speaking with the media about the racism he saw in the Naval aviation community and for speaking about his belief . . . that bottle bets are improper." Dkt. 28 at 45 (Am. Compl. ¶ 116). But the complaint says nothing that even suggests that the Executive Director (or the

Secretary of Defense) was a party to that targeting.  Plaintiff does go on to allege that the

Secretary of Defense "condoned" the targeting of Plaintiff based on his speech.  *Id.* at 46 (Am.

Compl. ¶ 118).  But nothing in the Executive Director's order suggests that she (or the Secretary)

condoned any such thing.  The Executive Director simply concluded that the Assistant Secretary

of the Navy had the legal authority to allow the second investigation to proceed and that the

Inspector General should consider Plaintiff's challenge to the second investigation in the first

instance.  Plaintiff had already succeeded before the Inspector General once, and nothing about

the Executive Director's order suggests that she—or the Under Secretary or Secretary of

Defense—intended to "condone" any wrongdoing by forwarding Plaintiff's claim to the

Inspector General once again.  Plaintiff is unlikely to succeed on his First Amendment claim as

to the Executive Director's order on appeal.

Plaintiff's procedural due process claim is somewhat stronger—at least he mentions it in

his motion.  He argues that Defendants have infringed a protected liberty interest by "savaging

[his] reputation and shredding his 12 years of honorable service, rendering him currently unable

to perform in his trained capacity . . . and now finally pursuing an adverse discharge premised on

what they know are reasons that are not true."  Dkt. 20-1 at 21.  A line of decisions from the D.C.

Circuit has delineated two situations in which the stigma or reputational harm associated with an

adverse government employment decision might infringe a protected liberty interest.  *See*

*O'Donnell v. Barry*, 148 F.3d 1126, 1139–42 (D.C. Cir. 1998); *Doe v. DOJ*, 753 F.2d 1092,

1104–12 (D.C. Cir. 1985); *see also Jefferson v. Harris*, 170 F. Supp. 3d 194, 205 (D.D.C. 2016)

(explaining that a government-employee plaintiff "may avail himself of two different legal

theories to establish a reputation-based due-process violation").  The first theory, known as a

"reputation-plus" claim, requires showing "the conjunction of official defamation and adverse

employment action." *O'Donnell*, 148 F.3d at 1140.  Although government defamation alone is not actionable, defamation in the course of termination is at least at times actionable.  *Id.* (citing *Paul v. Davis*, 424 U.S. 693, 710 (1976)).  The second theory, known as a "stigma-plus" claim, requires "the combination of an adverse employment action and 'a stigma or other disability that foreclosed [the plaintiff's] freedom to take advantage of other employment opportunities.'"  *Id.* (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 573 (1972)).  A stigma-plus claim differs from a reputation-plus claim in that "it does not depend on official *speech*, but on a continuing stigma or disability arising from official *action*."  *Id.* (emphasis added).

Here, Plaintiff contends that the allegations that he taught unsafe flight techniques will stigmatize him and will thus interfere with his ability to obtain future employment as a pilot, given the paramount importance of safety in the aviation industry.  Dkt. 20-1 at 21.  The problem for Plaintiff is that he has not alleged an adverse employment action sufficient to demonstrate a protected liberty interest.  To state either a "reputation-plus" or "stigma-plus" claim, a plaintiff must show that the reputational harm was associated with "discharge from government employment or *at least a demotion in rank and pay*."  *O'Donnell*, 148 F.3d at 1140 (citation omitted); *see also Wilson v. James*, 139 F. Supp. 3d 410, 430 (D.D.C. 2015), *aff'd* No. 15-5338, 2016 WL 3043746 (D.C. Cir. May 17, 2016) (holding that a servicemember plaintiff did not have a cognizable liberty interest in military employment absent discharge).  Plaintiff has neither been terminated nor demoted, and no such adverse employment actions is likely to occur until the ongoing administrative process has run its course.

Moreover, even if Plaintiff could show both reputational harm and an adverse employment action resulting from the second investigation, those harms would not flow from the Executive Director's order, which is the only final agency action currently subject to review.  In

considering Plaintiff's appeal, the Executive Director did not address the merits of the charges against Plaintiff or of his claims of retaliation.  Her order did not take any adverse employment action against Plaintiff, and Plaintiff has not alleged that the Executive Director's analysis of whether the Assistant Secretary of the Navy had authority to allow the second investigation harmed Plaintiff's reputation.  Plaintiff has not alleged, moreover, that he was due any additional process in his appeal, but rather simply takes issue with the Executive Director's consideration of the evidence presented and final decision.

If the process related to the second investigation results in Plaintiff's discharge or even if further adverse administrative action renders Plaintiff's discharge imminent, he might have a stronger due process claim directed at that separate final agency action.  But for now, Plaintiff has not shown that he is likely to succeed on the merits of a due process challenge to the Executive Director's order.

## B.      Irreparable Harm

The Court must also consider whether Plaintiff "is likely to suffer irreparable harm in the absence of preliminary relief."  *Winter*, 555 U.S. at 20.  "[A] showing that irreparable injury is 'likely' is the *sine qua non* for obtaining a preliminary injunction—it is what justifies the extraordinary remedy of granting relief before the parties have had the opportunity fully to develop the evidence and fully to present their respective cases."  *Jubilant DraxImage Inc. v. U.S. Int'l Trade Comm'n*, 490 F. Supp. 3d 169, 188 (D.D.C. 2020) (internal quotation marks and citation omitted); *see also Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) ("A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief."); *Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 241–42 (D.D.C.

2014); *Trudeau v. FTC*, 384 F. Supp. 2d 281, 296 (D.D.C. 2005), *aff'd*, 456 F.3d 178 (D.C. Cir. 2006).

To show irreparable harm, a plaintiff must demonstrate an injury that is "both certain and great; it must be actual and not theoretical." *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C.Cir.1985) (per curiam). "The moving party must show '[t]he injury complained of is of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm.'" *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (quoting *Wisc. Gas. Co.*, 758 F.2d at 674). The harm in question "must also be truly irreparable in the sense that it is 'beyond remediation.'" *Elec. Priv. Info. Ctr. v. Dep't of Just.*, 15 F. Supp. 3d 32, 44 (D.D.C. 2014) (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297). In cases involving claims related to military personnel decisions, moreover, courts have held that the showing of irreparable harm must be especially strong before an injunction is warranted, given the national security interests weighing against judicial intervention in military affairs. *See, e.g.*, *Spadone v. McHugh*, 842 F. Supp. 2d 295, 301 (D.D.C. 2012) ("When plaintiffs have requested an injunction preventing a military discharge, some courts have determined that plaintiffs must make a much stronger showing of irreparable harm . . . due to the magnitude of the interests weighing against judicial interference with the internal affairs of the armed forces." (internal quotation marks and citation omitted)); *see also Guerra v. Scruggs*, 942 F.2d 270, 274 (4th Cir. 1991); *Hartikka v. United States*, 754 F.2d 1516, 1518 (9th Cir.1985); *Veitch v. Danzig*, 135 F. Supp. 2d 32, 36–37 (D.D.C. 2001).

Plaintiff has failed to demonstrate that he is likely to suffer irreparable harm in the absence of an injunction preventing the transmittal of the Report of Misconduct or stopping the administrative process from proceeding further. He argues that an adverse discharge will result

in the loss of various benefits.  Dkt. 20-1 at 4, 21–22.  And he argues that his separation through a Board of Inquiry is a foregone conclusion, such that his discharge is "certain, real, and imminent."  Dkt. 29 at 22.  Plaintiff also asserts that even if Admiral Grady's direction that Plaintiff show cause is technically only a recommendation, "the reality of the situation is that Admiral Grady is a Four-Star Admiral—*the highest rank* in the Navy, and he is the Fleet Forces Commander, one step below the top officer in the Navy, Chief of Naval Operations."  *Id.* Plaintiff thus argues that it would be "absurd" to suggest that Admiral Grady's recommendation will not be followed.  *Id.* at 23.

But Plaintiff's discharge is neither as imminent nor as certain as he suggests.  Defendants represent that "[o]fficer misconduct and performance can take from 350 to 400 days to process from the date the Report of Misconduct is transmitted to Navy Personnel Command."  Dkt. 24 at 18.  In a supplemental filing, Defendants submit a chart indicating that the issuance of the order to show cause takes an average of 78 days, while the Board of Inquiry process averages 121 days.  Dkt. 31-1 at 2 (Ex. 8).  If Plaintiff's Report of Misconduct is transmitted on May 1, 2021, Defendants estimate that his likely date of discharge would fall in the spring or summer of 2022. Dkt. 24 at 18.  Much could change between now and then.  Despite Plaintiff's skepticism about the show-cause process, the Court cannot so easily dismiss the possibility that he will have a fair opportunity to make his case to a Board of Inquiry.  The Executive Director deferred to the Inspector General regarding Plaintiff's challenge to the second investigation, and the Inspector General may issue a decision in the intervening months.  Plaintiff has already prevailed before the Inspector General once, and he has offered no reason to believe that the Inspector General is biased or unprepared to consider his contentions with an open mind.  And even if Plaintiff were to be discharged under other than honorable conditions, he has not shown that the resulting

harms would be irreversible.  The discharge could be reversed, and Plaintiff could receive back pay.  As a result, Plaintiff has not shown that he will suffer immediate irreparable harm upon the issuance of the Report of Misconduct.

In the alternative, Plaintiff argues that "a separation based on Military Whistleblower Reprisal will only result in injury to his constitutional rights," and constitutional harms are often per se irreparable.  Dkt. 29 at 24.  But to the extent Plaintiff argues that those constitutional violations will occur upon his separation, the corresponding constitutional harms are no more imminent than his discharge.  In any event, the Court has already concluded that Plaintiff is unlikely to succeed on his constitutional claims as they pertain to the Executive Director's order, and any constitutional challenge to the second investigation is premature.

## C.    Balance of Equities and Public Interest

Because the Court concludes that Plaintiff has failed to show either a likelihood of success on the merits or irreparable harm, the Court need not consider the balance of equities or the public interest.  But, in any event, the public interest supports both robust legal protections for military whistleblowers and limited intrusion in military affairs from civilian courts.  Those twin goals are best achieved by permitting the administrative process to run its course.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Plaintiff's motion for preliminary injunction, Dkt. 20, is **DENIED**.

**SO ORDERED.**

/s/ Randolph D. Moss
RANDOLPH D. MOSS

Date: May 1, 2021

22